DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:20-cr-007 |
| ) | |
| JUWON CORDELLE POTTER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**ATTORNEYS:**

**Gretchen C.F. Shappert, United States Attorney**
**Kyle Payne, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
    *For the United States of America,*

**Matthew A. Campbell, Federal Public Defender**
**Melanie L. Turnbull, AFPD**
Office of the Federal Public Defender
St. Thomas, U.S.V.I.
    *For Defendant Juwon Cordelle Potter.*

## MEMORANDUM OPINION

**Molloy, C.J.**

    **BEFORE THE COURT** is Defendant Juwon Cordelle Potter's ("Potter") motion to suppress, filed March 16, 2020. ECF No. 26. The United States of America (the "Government") opposes Potter's Motion. ECF No. 31. The Court held an evidentiary hearing on December 2, 2020. After hearing testimony and the arguments of counsel, the Court took the matter under advisement. In his motion, Potter asks that the Court suppress both the photographic array identification of Potter, as well as any information recovered from the search of Potter's cell phone. For the reasons set forth below, Potter's motion will be granted as to the photo array and denied as to the cell phone.

## I.     FACTUAL AND PROCEDURAL HISTORY

The relevant facts in this case that pertain to the motion before the Court were adduced during the December 2, 2020 evidentiary hearing on this matter. The Court heard testimony from two witnesses: Kevin Florence, a Marine Interdiction Agent for Customs and Border Patrol ("CBP"), and Justin Kurtz, a Special Agent with Homeland Security Investigations ("HIS"). That testimony revealed the following facts.

Agent Florence testified that on January 22, 2020, he and two other agents were conducting a routine patrol of an area known as "the Narrows," the waterway between the British Virgin Islands and St. John, U.S. Virgin Islands, on a 44-foot CBP vessel. That day, Florence observed two vessels leaving Coral Bay, St. John in tandem. Both vessels were exiting Coral Bay headed east towards the southwestern side of Flanagan Island. As the CBP vessel approached the two boats exiting Coral Bay, one of the boats veered off to its starboard side as if to avoid the CBP vessel, then corrected course to resume travel in its original direction. Florence testified that this prompted him to stop the boats, at which time he encountered Potter, who was operating one of the two boats.

Agent Florence testified that upon initial questioning, the agents learned that Potter lacked any paperwork demonstrating permission to be present in the country. Potter further had no documentation for his vessel and claimed he did not know the captain of the other vessel, a Mr. Hopkins ("Hopkins"). However, Hopkins informed the agents that he knew Potter.

Agent Florence testified that the "sea state where we were at was a little rough," so the agents tied Potter and another individual's boats together and towed them both to a cove near Flanagan Island. ECF No. 55, at 10:1. The agents then instructed Potter to board their vessel and continued questioning him. Florence testified that during this questioning, Potter changed his explanation of what he was doing. Florence testified that Potter initially stated that he was "coming or leaving Coral Bay originally headed to the Willy T," and later stated that "actually, his vessel had broken down on him so he was adrift for approximately three hours." ECF No. 55, at 21:8-12. Florence testified that Potter stated that "he called Mr.

Hopkins, which was the individual on the other boat, to come out and assist him." ECF No. 55, at 22:1-4.

Florence testified, "just to corroborate [Potter's] story, to see whether he was telling the truth or not, I asked him for permission to see his phone so I could see his call log." ECF No. 55, at 22:7-9. Potter then said yes and handed his cell phone to Florence. Potter then unlocked his cell phone, and Florence proceeded to check the call log at the general time Potter said he was having engine troubles. Florence further testified that at no point did Potter refuse his request to look through the phone. Florence then returned Potter's phone and went to ask Hopkins questions to further corroborate Potters' account.

After Florence returned from questioning Hopkins, Potter was handcuffed. Agent Kurtz testified that Potter was handcuffed because "we had issues with him kind of messing around. He was wondering [sic] around the rear of the boat, wasn't being super compliant, so we ultimately placed him in handcuffs." ECF No. 55, at 39:21-24. While Potter was handcuffed, Agent Kurtz testified that he asked Potter if Potter "minded if I looked through" Potter's phone again. ECF No. 55, at 40:8-9. Potter "instantly" pulled the phone out of his pocket, unlocked it, and handed it to Kurtz. ECF No. 55, at 40:7. Upon review of the phone, Kurtz testified that he found "text messages and images that indicated that Mr. Potter had recently smuggled individuals into the United States." ECF No. 55, at 42:1-3. Specifically, Kurtz discovered "two pictures of separate male individuals with dark brown skin, black hair." ECF No. 55, at 42:8-9.

Kurtz then circulated the descriptions of the males pictured on Potter's phone to CBP officers on St. Thomas, which led to the detention of one of the males at the Red Hook Ferry Terminal in St. Thomas, a Mr. Patel ("Patel"). The same day Patel was detained, Kurtz had the opportunity to interview him. In Patel's initial interview, Kurtz testified that Patel stated that he had been in St. John for a couple of days, stayed at a hotel, and admitted to being brought from Tortola to St. John by an individual with long hair and no jewelry. Kurtz testified that Patel further described Potter as being dark skinned. Kurtz suspected Patel was not being truthful, because Kurtz had never heard of the hotel that Patel ostensibly stayed at.

Roughly two weeks later, Kurtz, an Assistant United States Attorney, Patel, and Patel's attorney met for a proffer. During that interview, Patel was shown pictures of Potter's and Hopkins' boats. Kurtz testified that Patel identified Potter's boat. ECF No. 55, at 47:5-13. Kurtz then showed Patel a photographic array containing Potter's picture. The photographic array contained six photos arranged in two rows of three pictures, with Potter appearing in the top-right box.

Upon viewing the photographic array, Patel was asked, "if any of these individuals looked familiar." ECF No. 55, at 48:25-49:1. Kurtz testified that Patel "almost instantly pointed to Photo #3, which is the picture of Mr. Potter that [Kurtz] had taken during the encounter on January 22nd." ECF No. 55, at 49:3-5. Kurtz further testified that "[l]ater on in the proffer, the Assistant United States Attorney asked to confirm, he said, the guy you pointed out in the picture earlier that was the guy that smuggled you over, brought you from Tortola to St. John, correct?" ECF No. 55, at 51:13-17. Patel confirmed the question "and said that was the individual." ECF No. 55, at 51:18-18. Kurtz testified on cross-examination that prior to the photographic identification, on January 24, 2020, that both Patel and Potter were present in the courtroom together for their initial appearances.[1] ECF No. 55, at 57:11-58:8. Kurtz further testified that while both Patel and Potter were in the courtroom together, Kurtz heard the Government represent to the Court that Patel and Potter's cases were related. ECF No. 55, at 58-9-12. At the time of the hearing where both Patel and Potter were present, both individuals were in handcuffs. ECF No. 55, at 58:21-23.[2]

Potter now moves for the suppression of both the information gathered from his cellular phone and the photographic identification.

## II. LEGAL STANDARD

### a. Consent search of cellular phone.

It is well settled that the Fourth Amendment protects suspects from unreasonable searches. U.S. Const. Amend. IV. "[A] search conducted without a warrant issued upon

---

[1] Kurtz testified that while he didn't recall the exact date, he believed the hearing was held January 24, 2020. The hearing in question, the parties' respective initial appearances, was held January 23, 2020. ECF No. 4.
[2] Further, both men were in custody and were transported together by the Marshals from the local detention facility to the courthouse.

probable cause is [presumptively] unreasonable... subject only to a few specifically established and well-delineated exceptions." *United States v. Williams*, 898 F.3d 323, 329 (3d Cir. 2018) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)) (brackets in original). A search conducted following the suspect's consent is one such "established exception." *Id.*

There are, however, limits to a suspect's consent. For instance, a suspect may limit the scope of the search to which he consents[3] or withdraw that consent during the search.[4] Relevant here, a suspect's consent to a warrantless search must be voluntarily given. *E.g., Bustamonte*, 412 U.S. at 222. The burden of demonstrating that consent was voluntarily given falls on the government, shown by the totality of the circumstances. *Id.* The "Fourth Amendment's ultimate touchstone is 'reasonableness,'" and whether the search was objectively reasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006) ("This Court has repeatedly rejected respondents' contention that, in assessing the reasonableness of an entry, consideration should be given to the subjective motivations of individual officers.") (citations omitted).

To determine whether a consent search was reasonable, the Court must evaluate several factors. Among others, "the critical factors comprising a totality of the circumstances inquiry include the setting in which the [search] consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]." *United States v. Crandell*, 554 F.3d 79, 88 (2009) (internal quotations omitted). An additional factor the Court may consider is whether the consenting individual had, or reasonably should have had, knowledge if his right to refuse consent. *U.S. v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011); *but see United States v. Spivey*, 861 F.3d 1207, 1216 (11th Cir. 2017) (opining that while the defendant's awareness of his right to refuse is a rightly considered factor, it is not dispositive of the presence or lack of voluntary consent).

---

[3] *Florida v. Jimeno*, 500 U.S. 248 (1991).
[4] *Williams*, 898 F.3d 323.

*United States v. Potter*
Case No. 3:20-cr-0007
Memorandum Opinion
Page 6 of 16

### b. Photographic identification.

Due process concerns are implicated in photo identifications where "the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime. *Perry v. New Hampshire*, 132 S. Ct. 716, 720 (2012); *see also United States v. Brownlee*, 454 F.3d 131, 137-39 (3d Cir. 2006). The determination of suggestiveness is fact intensive and is itself not sufficient to warrant suppression. *See, e.g., United States v. Lawrence*, 349 F.3d 109, 115-17 (3d Cir. 2003); *United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014); *United States v. Foote*, 432 F. App'x 151 (3d Cir. 2011). Relevant here, "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967).

In considering if a photo identification should be suppressed, the Court is directed to engage in a two-step analysis. First, the Court determines whether the procedure utilized was "unnecessarily or impermissibly suggestive," making this determination by weighing the actual suggestiveness of the identification against whether there was a good reason for the failure to utilize less suggestive procedures. *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991). If the Court determines that the identification was unduly suggestive, it then must determine whether, in light of the suggestiveness, the identification was nevertheless reliable. *Id.*; *Thomas v. Varner*, 428 F.3d 491, 503 (3d Cir. 2005). While the initial burden of demonstrating suggestiveness is on the defendant, "[i]t is only after the defendant meets this burden that the burden shifts to the government to prove that the identification was reliable independent of the suggestive procedure." *English v. Cody*, 241 F.3d 1279, 1282-83 (10th Cir. 2001); *see also United States v. Jones*, 689 F.3d 12, 17 (1st Cir. 2012) ("where a court finds that the identification procedure used was unnecessarily suggestive, suppression is appropriate unless the government carries the burden of showing, under the totality of the circumstances, that the identification was still reliable.").

The determination of reliability is made by considering the totality of the circumstances, weighing (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the

confrontation; and (5) and the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). To warrant suppression, the Court must determine both that the identification was unduly suggestive, and that the identification was not independently reliable. *Varner*, 428 F.3d at 503.

### III.    DISCUSSION

Potter seeks suppression of both the search of his cellular phone and of Patel's photographic identification. The gravamen of Potter's argument regarding his cellular phone is that while he consented to the search of his phone, the consent was not voluntarily given. As to the photographic identification, Potter argues that the identification amounted to a "show up," and that it was impermissibly suggestive and unreliable. As set forth below, the Court finds that only Potter's argument as to the identification is convincing. Accordingly, Potter's motion will be denied as to the consent search of his cellular phone and granted as to the photographic identification.

### a.    Potter's consent to the search of his cellular phone was voluntarily given.

Potter argues that his consent to the agents' search of his phone was not voluntarily given. It is unclear whether Potter objects to both the initial call log search and the subsequent more thorough search of his phone, or only the latter. However, Potter argues that he was detained, towed, and brought onto the agents' vessel before consenting to the initial call log search. Immediately thereafter, Potter argues that the agents handcuffed him, placed him on his knees, and asked if Potter would allow them to search his phone again. Potter asserts that the agents never informed him that he could refuse consent, and that he could not be imputed of the knowledge that he could have refused the search because he is a BVI resident, not a U.S. resident.

The Government counters that Potter's consent was voluntary and freely given. The Government argues that Potter was brought onto the agents' vessel for questioning and was handcuffed because he was nervously pacing and was explicitly informed that he was not under arrest. The agents initially requested to view Potter's call log to verify his story that he had called a friend to tow him after having engine trouble. The agents saw no tow lines or outgoing phone calls to corroborate this story, but returned Potter's phone to him. The

agents then asked Potter to view his phone again, at which point Potter reached into his pocket, unlocked his phone, and handed it to one of the agents. That agent then saw text messages indicating that Potter was involved with smuggling people into the United States and then placed him under arrest.

The Government further asserts that its search of Potter's phone is permissible as a border search. Potter was in U.S. waters, stated he was not a U.S. Citizen, and lacked any documentation allowing him to be present in the United States. The Government asserts that this independently gave the agents authority to search both Potter and his effects, including his phone. So, even if Potter's consent was invalid, the Government argues that the search was valid under the border search theory where no individualized suspicion is required for routine searches of persons and effects crossing the border, citing *U.S. v. Ezeiruaku*, 936 F.2d 136, 140 (3d Cir. 1990) in support.

Neither party disputes that Potter was seized or that the Government was reasonable in doing so, so the Court will proceed directly to whether the subsequent search was permissible. The analysis prescribed to determine the voluntariness of consent in a search is straightforward, requiring the Court to weigh the totality of the circumstances. The "critical factors comprising a totality of the circumstances inquiry include the setting in which the [search] consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting [party]." *Crandell*, 554 F.3d at 88 (internal quotations omitted). The Court may also consider is whether the consenting individual had, or reasonably should have had, knowledge of his right to refuse consent. *Stabile*, 633 F.3d at 231.

Potter's motion leans heavily on the contention that the Government did not inform Potter of his right to refuse the search, and that Potter could not have had knowledge of his right to refuse consent considering his status as a British Virgin Islands resident. ECF No. 36, at 12-13. However, the Supreme Court "has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search." *U.S. v. Drayton*, 536 U.S. 194, 206 (2002) (citing, *e.g.*, *Ohio v. Robinette*, 519 U.S. 33, 39-40 (1996)). "While knowledge of the right to refuse

consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." *Id.* at 206-07. Nor does any "presumption of invalidity attach[] if a citizen consented without explicit notification that he or she was free to refuse to cooperate." *Id.* at 207. Rather, the Supreme Court has repeatedly instructed that "the totality of circumstances must control, without giving additional weight to the absence of this type of warning." *Id.* (collecting cases).

Here, the Court finds that there were two distinct instances where Potter consented to have his phone searched. The first instance came after Potter's boat had been towed to calmer waters near Flanagan's Island. At that point, Potter's vessel had been seized and he was not free to leave, but Potter had not yet been handcuffed. The second instance came after Potter had been handcuffed. Kurtz testified that the agents "had issues with [Potter] kind of messing around. He was wondering [sic] around the rear of the boat, wasn't being super compliant, so we ultimately placed him in handcuffs." ECF No. 55, at 39:21-24. Once handcuffed, the agents placed a life jacket on Potter for safety in case he went overboard. ECF No. 55, at 39:24-40:4. Kurtz testified that Potter was allowed to remain standing and was handcuffed with his hands in front of his body both for comfort and safety. ECF No. 55, at 40:1-20.

While the agents did not inform Potter of his right to refuse the searches, the agents each requested Potter's permission to search rather than command compliance. Although Potter was handcuffed for the second search, his hands were in front of him, his movement was not otherwise restricted within the Government's vessel, and he was able to reach into his own pocket, retrieve the phone, and unlock it for Kurtz. Moreover, there was no testimony to indicate that Potter was threatened or that his consent was coerced. The Court therefore finds that Potter's consent to both searches of his cellular phone was voluntarily given, and that the Government's searches were in turn reasonable. *Cf. id.* ("Although Officer Lang did not inform respondents of their right to refuse the search, he did request permission to search, and the totality of the circumstances indicates that their consent was voluntary, so the searches were reasonable.").

### b. The photographic identification was unduly suggestive and unreliable.

Potter argues that Patel's identification amounts to a show-up identification, wherein the Government suggested that Potter was the culprit preceding the photo lineup and was therefore impermissibly suggestive. Potter further argues that the manner in which the Government presented Patel with the photo array was not in accordance to best practices, and therefore, too, was impermissible suggestive. Instead of showing Patel a single page with six photos, Potter suggests that the Government should have shown Patel a sequence of photographs, one after another.

In addition to the suggestiveness of the photo identification, Potter argues that Patel's eyewitness identification is not reliable under the *Biggers*[5] factors. Potter argues that Patel would have had enough time with Potter to make a valid identification, disfavoring suppression; that Patel would have been distracted and overwhelmed by the number of people he met on his journey from India to Tortola, favoring suppression; that Patel gave an inaccurate description of the man who captained the boat which carried him from Tortola to St. John, favoring suppression; that he expressed a lack of certainty at the photo identification, favoring suppression; and that two weeks had passed between the initial interaction and the photo identification, favoring suppression.

In its Opposition, the Government does not address Potter's argument that the custodial contact between Patel and Potter tainted the subsequent photo identification. Regarding the identification, the Government argues that the photo array itself was not impermissibly suggestive. To the contrary, the Government asserts that the six-photo array, attached to the Government's Opposition as Exhibit 1, depicted six individuals with similar features and no impermissibly suggestive distinctive details (such as jewelry), and that Patel immediately pointed to Potter's photo. The Government further asserts that had they provided sequential photos as Potter suggests, Potter could have challenged that identification based on the order in which those photos were displayed.

The Government further contends that even if the lineup were suggestive, Patel's identification was nevertheless reliable, also applying the *Biggers* factors. The Government

---

[5] *Biggers*, 409 U.S. at 199-200.

argues that Patel had the opportunity to view Potter at the time of the crime, weighing against suppression; that Patel spent a significant period of time on a small boat in immediate proximity to Potter, that Patel would have paid attention to Potter's directions, and that the two would have interacted at that time, weighing against suppression; that even though Patel described a different individual initially, he did so in an attempt to obscure the identity of his alleged smuggler, weighing neutrally; that Patel did not hesitate in identifying Potter in the photo array, weighing against suppression; and that the thirteen-day period between the crime and the photo identification does not outweigh the strength of the other factors.

In reviewing the record as it applies to the photographic lineup, the Court must first determine whether the procedure utilized was "unnecessarily or impermissibly suggestive," making this determination by weighing the actual suggestiveness of the identification against whether there was a good reason for the failure to utilize less suggestive procedures. *Stevens*, 935 F.2d at 1389. "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967). This method, called a 'show up identification,' is so widely condemned that it is considered "inherently suggestive because, by its very nature, it suggests that the police think they have caught the perpetrator of the crime." *Brownlee*, 454 F.3d at 138.

In *Brownlee*, the defendant was handcuffed and seated in the back seat of a police cruiser when two witnesses identified him, and was handcuffed and pulled out of the police cruiser when two other witnesses identified him. *Id.* The *Brownlee* Court found that the fact that the defendant was handcuffed, was surrounded by police officers, and was at the scene of the accident all combined to create the impression that police had caught the suspect they thought committed the crime, and the Court held that the procedure was unnecessarily suggestive. *Id.* Here, Potter appeared in court at the same time as Patel for their initial appearances before the magistrate judge. In fact, both men appeared in court together. At that time, Potter was handcuffed, and the Government represented to the Court, in front of both men, that their cases were related. Less than two weeks later, Patel identified Potter from the photo array.

Case: 3:20-cr-00007-RAM-RM   Document #: 65   Filed: 05/19/21   Page 12 of 16

*United States v. Potter*
Case No. 3:20-cr-0007
Memorandum Opinion
Page 12 of 16

The Court finds that the instant facts rise to a higher level of suggestiveness than in *Brownlee*. In *Brownlee*, the gravamen of the Court's holding was that the show-up identification was inherently suggestive because the identifications were made in circumstances that suggested the police had suspected Brownlee of the crime at hand. Similarly, it is unreasonable to believe that Patel could have made any other conclusion: Patel was appearing in court accused of being smuggled into the United States next to Potter, who the Government represented was accused of an offense related to Patel's. Any subsequent identification Patel made of Potter is therefore necessarily tainted after the Government itself represented, in Patel's presence, that Potter's offense was related to Patel's.

The photo array presented to Patel does nothing to dissuade the suggestiveness of the initial encounter. The use of a photo array may violate due process "when police attempt to emphasize the photograph of a given suspect, or when circumstances surrounding the array unduly suggest who an identifying witness should select." *Lawrence*, 349 F.3d at 115 (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)); *see also United States v. Ladson*, 238 Fed. App'x 874, 877 (3d Cir. 2007). "The key question is whether differences in characteristics sufficiently distinguish a defendant to suggest culpability." *United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014).

The photo array Patel used in identifying Potter contained six images, with Potter located in the upper-right hand corner. Of the six images, three are of such low resolution as to render the individual facial features of those images nearly unrecognizable. Further, each of the three low-resolution images depict individuals of darker skin tone than Potter. Two of these three low-resolution images include men with longer braided hair. The three remaining images include Potter, a man of similar skin tone set on a different background, in dimmer light, and lacking facial hair, as well as third individual of a different race and skin tone. It also appears that Potter is smiling in the image of his photo array. No other person is smiling in the photo array. Moreover, of the three remaining images of a reasonable resolution, Potter's image is clearer and significantly brighter; so much so that Potter's image appears highlighted in contrast to the other five images. Given this, the Court concludes that there is little question that the photo array "emphasize[s] the photograph of a given suspect,"

specifically Potter. *Lawrence*, 349 F.3d at 115 (citations omitted). Further, even if the photo array was not itself so egregious as to emphasize Potter's image over the others, the Court finds that "circumstances surrounding the array unduly suggest who an identifying witness should select." *Id. W*hen coupled with the impermissible custodial encounter preceding it, the Court finds that the circumstances surrounding Patel's photo identification of Potter were unduly suggestive.

This finding does not end the analysis of suggestiveness, however. The Court is further tasked with determining whether there was a good reason for the failure to utilize less suggestive procedures. *Stevens*, 935 F.2d at 1389. Here, the Court finds no such reason. The Government could have requested scheduling such that the men did not appear in court at the same time, and moreover could have asked for a private sidebar to represent to the Court that the two men's cases were related. As to the photo array itself, the Government easily could have utilized photos of more similar-looking suspects portrayed with similar backgrounds in similar resolution. Or, the Government could have made any one of these changes to make the photo array less suggestive. The Government took no such precautions, and as such, has no excuse for its failure to utilize less suggestive procedures.

Having found that Patel's identification of Potter was rooted in unduly suggestive circumstances, the Court must now determine whether those circumstances created a "'substantial likelihood of misidentification,' in light of the totality of the circumstances." *United States v. Emanuele*, 51 F.3d 1123, 1130 (3d Cir. 1995) (quoting *Government of the Virgin Islands v. Riley*, 938 F.2d 224, 228 (3d Cir. 1992)). The relevant factors here are those outlined in *Biggers*, weighing: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) and the length of time between the crime and the confrontation. *Biggers*, 409 U.S. at 199-200.

Here, Patel would have had a short but reasonable opportunity to view Potter during the trip from Tortola to St. John. No evidence appears on the record as to the precise length of the boat trip. The relevant distances vary significantly, from roughly two miles at Tortola

and St. John's closest points to more than a dozen at their furthest. The Government suggests that the Court take judicial notice of the timing as "more than five minutes." ECF No. 55, at 71:1-4. Potter suggests a time of "at least twenty minutes." ECF No. 26, at 8. The Court finds that even between their closest points, Patel would have had ample opportunity to view Potter at the time of the crime.

As to the second factor, during the voyage between Tortola and St. John, Patel was allegedly on the last leg of a long journey to St. John, and at the time was allegedly committing a crime himself. The Government argues that Patel would have diligently paid attention to Potter awaiting instruction, but Potter offers the reasonable conclusion that Patel would have been looking around the boat during its travel, and not giving Potter his undivided attention. However, there is no testimony on the record, direct or hearsay, allowing anything more than speculation as to this factor. The lack of evidence as to this factor preclude its meaningful consideration.

The third factor considers the accuracy of the witness' prior description. This description was completely inaccurate. In fact, Patel may well have been giving the description in terms of opposites as compared to Potter's actual appearance at the time of Potter's arrest. Patel described the individual who transported him as having dark skin, long hair, and no jewelry, while Potter at the time of his arrest had light skin, short hair, and wore several pieces of jewelry. The Government argues that Patel gave the opposite description to conceal Potter's identity, but the Court cannot so speculate as to Patel's motives. Rather than take the inaccuracy of Patel's description at face value, the Government appears to argue that this factor should weigh in its favor regardless of the actual description: the Government asserts that an entirely inaccurate description is somehow proof of the reliability of the identification, and yet surely would argue that an *accurate* description proved the same result. The Government cannot have it both ways, especially when it proposes that the Court rely on conjecture to assign accuracy to a diametrically inverted description. The facts on the record indicate that Patel's initial description was wholly inaccurate. Additionally relevant here is the consideration of "whether subsequent viewings create a substantial risk of misidentification may depend on the strength and propriety of the initial identification."

*Emanuele*, 51 F.3d at 1131. In the interim, between Patel's wholly inaccurate description and his identification of Potter's photograph, Patel and Potter encountered each other in open court, while handcuffed, where the Government represented that their cases were related.

The fourth and fifth factors do not bolster reliability. On one hand, Patel's identification of Potter was made conditionally, with Kurtz testifying that Patel indicated Potter's photograph while saying he "looks like this but." ECF No. 55, at 56:21-25. On the other, Kurtz testified that Patel "almost instantly pointed to Photo #3, which is the picture of Mr. Potter… ." ECF No. 55, at 49. As to the length of time, Patel's photographic identification was made roughly two weeks after the alleged crime. While two weeks is a short enough period of time to be reliable, *U.S. v. Barrett,* 703 F.2d 1076, 1085 (9th Cir. 1983), the Court finds that given the totality of circumstances in this case, no degree of temporal proximity can be found to increase reliability considering the custodial contact between Patel and Potter coupled with the Government's assertion of relatedness. *Cf. Mata v. Sumner*, 696 F.2d 1244, 1253-56 (9th Cir. 1983) (finding that despite an eleven-day period between crime and confrontation, the identification procedures were "impermissibly suggestive") (vacated on other grounds).

Considering the five *Biggers* factors, the Court is unable to find that the identification was sufficiently reliable to outweigh its suggestive origins. *See Manson v. Braithwaite*, 432 U.S. 98, 114 (1977) (instructing the Court to weigh the *Biggers* factors against "the corrupting effect of the suggestive identification itself."). Importantly, it is not Potter's responsibility to show that the photographic identification was unreliable, but rather the Government's burden to prove the reliability of the identification in spite of the suggestive circumstances. *Cody*, 241 F.3d at 1282-83; *Jones*, 689 F.3d at 17. Here, the Government has not carried its burden to demonstrate that Patel's identification was reliable.

The suggestiveness of the procedure utilized here cannot be overcome. Patel was held in custody, transported, and made his initial appearance alongside a handcuffed Potter, at which time the Government represented to the Court that the two men's cases were related. Patel then identified Potter upon being asked if "if any of these individuals looked familiar." On the basis of this, and that prior to the custodial encounter Patel's description of Potter

was diametrically inaccurate, the Court finds that Patel's photographic identification of Potter was unduly suggestive and created a "'substantial likelihood of misidentification,' in light of the totality of the circumstances." *Emanuele*, 51 F.3d at 1130 (quoting *Riley*, 938 F.2d at 228). Accordingly, the photographic identification of Potter will be suppressed.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that the Government's search of Potter's cellular phone was reasonable, and that Potter's consent was voluntarily given. The Court further finds that the photographic identification of Potter was made under unduly suggestive circumstances and created a substantial risk of misidentification. Accordingly, the Court will deny Potter's motion to suppress as to the search of his cellular phone and grant the motion as to the photographic identification by separate Order.

**Dated:** May 19, 2021                                    /s/ *Robert A. Molloy*
                                                          **ROBERT A. MOLLOY**
                                                          **Chief Judge**